UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                    MASTER FILE NO. 12-md-02311

_____

In re: Bearings                         HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:

All Cases                               2:12-cv-00500
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINTS**

Before the Court is Defendants NTN Corporation ("NTN") and NTN USA Corporation's ("NTN USA") Motion to Dismiss the Direct Purchaser, Automobile Dealer, and End-Payor Plaintiffs' Consolidated Amended Complaints. (Doc. No. 117). The Court heard oral argument on the motion on June 4, 2014, and at the conclusion of the hearing took the matter under advisement. For the reasons stated below, Defendants' motion is **DENIED**.

I.  **STATEMENT OF FACTS**

Direct Purchaser Plaintiffs ("DPPs"), Automobile Dealership Plaintiffs ("ADPs"), and End-Payor Plaintiffs ("EPPs") (collectively referred to as "Plaintiffs") filed separate consolidated class action complaints alleging several federal and state law claims against Defendants. Plaintiffs allege Defendants engaged in a conspiracy to "inflate, fix, raise, maintain, or artificially stabilize prices of Bearings sold in the United States" for which they seek damages and other appropriate equitable relief. See e.g. (Case No.

12-501, Doc. No. 100 at ¶ 1). Generally, Defendants are in the business of manufacturing or selling Bearings, which are defined in Plaintiffs' complaints as "friction-reducing devices that allow one moving part to glide past another moving part" and are used in the manufacture of automobiles. See e.g. (Id. at ¶¶ 43, 44).

Defendant NTN Corporation ("NTN") is a Japanese corporation with its principal place of business in Osaka, Japan. (Case No. 12-501, Doc. No. 100 at ¶ 27; Case No. 12-502, Doc. No. 67 at ¶ 140; Case No. 12-503, Doc. No. 70 at ¶ 95). NTN is the 100% owner of Defendant NTN USA Corporation ("NTN USA"), incorporated in Delaware with its principal place of business in Mount Prospect, Illinois. (Id. at ¶ 28). On March 29, 2013, the Japan Fair Trade Commission ("JFTC") issued cease and desist orders against NTN and two of its co-conspirators for their involvement in a price-fixing conspiracy related to the sale of Bearings. (Case No. 12-501, Doc. No. 100 at ¶ 73; Case No. 12-502, Doc. No. 67 at ¶ 13; Case No. 12-503, Doc. No. 70 at ¶ 135). The JFTC fined NTN 7.2 billion yen, the largest amongst the conspirators. (Case No. 12-501, Doc. No. 100 at ¶ 73; Case No. 12-503, Doc. No. 70 at ¶ 135). During the investigation, NTN admitted to its participation in the Japanese conspiracy. (Case No. 12-501, Doc. No. 100 at ¶ 66; Case No. 12-502, Doc. No. 67 at ¶ 191; Case. No. 12-503, Doc. No. 70 at ¶ 130). NTN also confirmed that the Department of Justice issued a subpoena to NTN USA requesting information related to the transaction of Bearings. (Case No. 12-501, Doc. No. 100 at ¶ 78; Case No. 12-502, Doc. No. 67 at ¶ 182; Case. No. 12-503, Doc. No. 70 at ¶ 139).

Plaintiffs allege that NTN USA was under the direction and control of NTN during the relevant class period. (Case No. 12-501, Doc. No. 100 at ¶ 28; Case No. 12-502,

Doc. No. 67 at ¶ 141; Case No. 12-503, Doc. No. 70 at ¶ 95).  In their respective complaints, Plaintiffs further allege that NTN, directly or through its subsidiaries including NTN USA, manufactured, marketed or sold Bearings that were purchased in the United States.  (Case No. 12-501, Doc. No. 100 at ¶ 27; Case No. 12-502, Doc. No. 67 at ¶ 140; Case No. 12-503, Doc. No. 70 at ¶¶ 95, 96).  NTN and NTN USA are also alleged to have shared numerous executives. (Case No. 12-502, Doc. No. 67 at ¶ 142; Case No. 12-503, Doc. No. 70 at ¶ 97).  ADPs allege that NTNAmericas.com reflects that NTN USA views itself as a part of NTN, not a separate entity.  (Case No. 12-502, Doc. No. 67 at ¶ 143).

According to DPPs, NTN exports approximately 55% of the Bearings it manufactures to the United States and Europe.  (Case No. 12-501, Doc. No. 100 at ¶ 117).  Plaintiffs further allege NTN is a member of the World Bearings Association. (Case No. 12-501, Doc. No. 100 at ¶ 101; Case No. 12-502, Doc. No. 67 at ¶ 176; Case No. 12-503, Doc. No. 70 at ¶ 160).  In addition, EPPs allege that NTN, NTN USA, and their co-conspirators met at industry events and trade shows to perform acts in furtherance of the conspiracy.  (Case No. 12-503, Doc. No. 70 at ¶ 159).

Plaintiffs further allege that the Bearings market is conducive to anticompetitive conduct.  Specifically, the market has high barriers to entry, has inelasticity of demand, is highly concentrated, and provides numerous opportunities to conspire.  (Case No. 12-501, Doc. No. 100 at ¶ 49; Case No. 12-502, Doc. No. 67 at ¶ 166; Case No. 12-503, Doc. No. 70 at ¶ 115).  The complaints also allege that the market for Bearings is controlled by a small number of manufacturers, including NTN and NTN USA.  (Case No. 12-501, Doc. No. 100 at ¶ 51; Case No. 12-502, Doc. No. 67 at ¶ 163; Case No. 12-

503, Doc. No. 70 at ¶ 108). DPPs allege that eleven Defendants, including NTN and NTN USA, control 60% of the global market share. (Case No. 12-501, Doc. No. 100 at ¶ 52). In addition, DPPs allege that during the past decade, "the number of [Bearings] firms has been steadily decreasing and market share is continually shifting towards the Bearings industry's largest participants." (Id. at ¶ 51).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint which fails "to state a claim upon which relief can be granted." To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must show that his complaint alleges facts which, if proven, would entitle him to relief. First Am. Title Co. v. DeVaugh, 480 F.3d 438, 443 (6th Cir. 2007). "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997).

When reviewing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'" Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

In Twombly, the Supreme Court considered the pleading requirements necessary to withstand a motion to dismiss relative to a Section 1 Sherman Act claim. It held that the complaint must contain enough factual matter to "plausibly suggest" an agreement:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

550 U.S. at 556.

### III. ANALYSIS

Defendants' motion to dismiss sets forth two grounds for dismissal: (1) Plaintiffs' complaints fail to specifically allege NTN's involvement in the conspiracy, and (2) Plaintiffs' complaints fail to sufficiently allege that NTN USA is an alter-ego of NTN, thereby implicating NTN USA in the alleged conspiracy. The Court first turns to the sufficiency of the allegations against NTN.

#### A. NTN

In analyzing a motion to dismiss, the Court must assume the veracity of nonconclusory allegations in the complaint. Twombly, 550 U.S. at 570. Plaintiffs' complaints describe a worldwide conspiracy to fix the price of automotive bearings, which caused the price of bearings in the United States to increase and injure Plaintiffs. NTN is alleged to have directly participated by selling price-fixed bearings through its United States subsidiary, NTN USA. The complaint alleges that Defendants met at various trade shows in furtherance of the conspiracy and sufficiently alleges that the

5

bearings market was vulnerable to anticompetitive activity. In addition, the JFTC charged NTN and its co-conspirators with participating in a conspiracy to fix the price of bearings in Japan, in which NTN admitted its guilt and received the largest fine. Moreover, several co-conspirators of NTN pleaded guilty to participating in the conspiracy or are under investigation in the United States, Europe, Australia, Canada, Korea, and Japan. See (Case No. 12-501, Doc. No. 100 at ¶¶ 68-73, 81, 84, 85, 87, 88, 91-93, 98, 99).

NTN argues that in conjunction with Plaintiffs' vague references to "Defendants" throughout their complaints, Plaintiffs fail to allege a "specific time, place, or person involved in the alleged conspiracies" or any single meeting or communication with any co-Defendant. See Twombly, 550 U.S. at 564 n.10. In other words, NTN asserts there are insufficient allegations to plausibly suggest that it participated in the alleged conspiracy. In addition, NTN asserts that its involvement in foreign investigations does not support its involvement in a conspiracy aimed at the United States.

Contrary to NTN's argument, Plaintiffs need not identify the specific time, place, or person involved in the conspiracy. See Starr v. Sony BMG Music Entm't, 592 F.3d 314, 325 (2d Cir. 2010) (noting that where the plaintiffs relied on parallel conduct to show an agreement, allegations of specific time, place, or person are unnecessary). Although Plaintiffs in this case do not allege parallel conduct, NTN and several of its co-conspirators, who are alleged to be major participants in the international bearings market, pled guilty to a conspiracy to price-fix bearings in at least one country. This is not merely the "if it happened there, it could have happened here" situation. See In re Elevator Antitrust Litig., 502 F.3d 47, 52 (2d Cir. 2007) ("Allegations of anticompetitive

wrongdoing in Europe – absent any evidence of linkage between such foreign conduct and conduct here – is merely to suggest . . . that 'if it happened there, it could have happened here.'"). Here, Plaintiffs alleged ample facts plausibly extending the conspiracies uncovered in other countries to the United States.

This result is consistent with the Sixth Circuit's decision in Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430 (6th Cir. 2012). In that case, the plaintiff alleged a conspiracy directed at the United States based on the results of a European Commission ("EC") investigation that found the defendants liable for anticompetitive conduct in Europe. Id. at 436. The EC investigation did not "address whether any conspiracy extended beyond the European markets." Id. In denying the defendants' motion to dismiss, the appellate court noted that the "silence on the part of the EC decision as to the U.S. markets may simply reflect the limited scope of the decision" and that the plaintiff is not bound by the findings of a foreign investigation. Id. at 441. Rather, the plaintiff may provide "additional circumstantial allegations that corroborate its claim" that the conspiracy extended into the United States. Id. at 442.

Similar to Carrier Corp, Plaintiffs in this case provide a plethora of allegations relating to the conduct of NTN and its co-conspirators, many of which have pleaded guilty to price-fixing bearings in the United States and other countries. NTN's argument that its conduct was limited only to price-fixing bearing in the Japanese market seems to ignore the fact that it faced the largest fine imposed by the JFTC among its co-conspirators. It stands contrary to reason that NTN played the largest role in the conspiracy aimed at the Japanese market, but decided to exercise restraint in targeting the United States market, where it operated a wholly-owned subsidiary capable of

7

manufacturing and distributing bearings across the United States.  The Court rejected similar arguments from the defendants in the Wire Harness case, and it declines to depart from the reasoning it articulated in those decisions.  See In re Automotive Parts Antitrust Litig., 2013 WL 2456013, at *3 (E.D. Mich. June 6, 2013) (Tokai Rika plead guilty to price-fixing heater control panels, but not wire harness systems); In re Automotive Parts Antitrust Litig., 2013 WL 2456610, at *3 (E.D. Mich. June 6, 2013) (Leoni investigated by EC, but no investigation in United States); In re Automotive Parts Antitrust Litig., 2013 WL 2456010, at *2 (E.D. Mich. June 6, 2013) (Lear investigated by EC in Europe, but not in United States).

Consequently, Plaintiffs' allegations certainly support the existence of global anticompetitive cartel activity in the bearings market.  NTN was a major participant in a Japanese conspiracy and its co-conspirators have now pleaded guilty to antitrust violations in the United States.  NTN exported a substantial amount of bearings to the United States market during the alleged conspiracy.  Taken together, these allegations nudge Plaintiffs' claims from "conceivable to plausible," Twombly, 550 U.S. at 570, and Plaintiffs met their pleading burden with respect to NTN.

### B.     NTN USA

Generally, "[a] parent corporation [ ] is not liable for the acts of its subsidiary, even if its subsidiary is wholly-owned." Corrigan v. U.S. Steel Corp., 478 F.3d 718, 724 (6th Cir. 2007) (citing United States v. Bestfoods, 524 U.S. 51, 61 (1998)).  However, under Michigan law, the corporate veil may be pierced if "the corporate entity [is] a mere instrumentality of another individual or entity." Rymal v. Baergen, 686 N.W.2d 241, 252 (Mich. Ct. App. 2004).  In order for courts to treat the parent and subsidiary as a single

8

entity, the "corporate entity must have been used to commit a wrong or fraud" resulting in an "unjust injury or loss to the plaintiff." Id. The question is whether the parent's "control over the [subsidiary] was sufficiently extensive to permit imputation of the conspiracy to the [subsidiary]." Carrier Corp., 673 F.3d at 445.

NTN USA asserts that Plaintiffs failed to allege sufficient facts to support an inference that it is an alter-ego of its parent company, NTN. It further argues that there are no specific allegations made against it in the complaints. Instead, NTN USA is grouped with NTN as the "NTN Defendants" and Plaintiffs do not specify the roles each played in the conspiracy. NTN USA asserts it is even farther removed from the conspiracy because the JFTC never charged it with any wrongdoing and it is currently not under investigation for anticompetitive conduct in any country.

Plaintiffs allege that NTN USA is wholly owned and controlled by NTN, which controlled NTN USA's policies, sales, and finances. (Case No. 12-502, Doc. No. 67 at ¶ 141). It is alleged that NTN USA manufactured, marketed, and sold bearings in the United States at the behest of NTN. Further, Plaintiffs allege that NTN USA is one of NTN's American entities, which "view themselves as NTN Corporation, their Japanese parent, and not as separate entities." (Id. at ¶ 143). Last, Plaintiffs allege that that NTN and NTN USA have shared numerous executives.

NTN USA asserts that "the fact that no NTN company has pled guilty or been charged in the United States after [receiving a DOJ subpoena two years ago] can only weaken, not support, Plaintiffs' claims." (Doc. No. 117 at 11). However, the actions of the DOJ do not operate to limit the scope of the alleged conspiracy. See In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1011-12 (E.D. Mich. 2010)

(observing that "civil litigation" cannot be "circumscribed or defined by the boundaries of the criminal investigations"). The investigation is ongoing, and there are several factors, including government resources and strategy, which affect such decisions.

At this stage, the Court finds that Plaintiffs' allegations against NTN USA are sufficient. Viewed in their entirety, the allegations support an inference that NTN USA participated in a price-fixing conspiracy aimed at the United States under the direction of NTN. Again, the Sixth Circuit's analysis in Carrier Corp. compels this result. There, the plaintiff alleged that the defendant subsidiary sold the price-fixed product in the United States under the direction of its parent company, that the parent and subsidiary were held out as a single global enterprise, and that the companies shared key executives. 673 F.3d at 446. Similar to the instant case, the parent company pleaded guilty to anticompetitive conduct in a foreign country, but not in the United States. Id. at 436 ("The EC's findings, however, do not identify any conspiratorial agreements with respect to U.S. markets."). Nonetheless, the court found the allegations sufficient to state a claim against the United States subsidiary under an alter-ego theory of liability. Id. at 445-46.

Here, Plaintiffs allege similar facts to those alleged in Carrier Corp., which demonstrate the plausibility of NTN USA selling price-fixed bearings under the direction and control of its parent, NTN. See also In re Cathode Ray Tube (CRT) Antitrust Litig., 738 F. Supp. 2d 1011, 1020 (N.D. Cal. 2010) (finding allegations sufficient to state a claim against subsidiaries where the plaintiffs alleged that the parent companies "dominated and controlled the finances, policies, and affairs" of the subsidiaries).

Consequently, accepting the allegations as true, the Court finds that Plaintiffs met their pleading burden with respect to NTN USA.

### C. Foreign Trade Antitrust Improvements Act

Lastly, the Court addresses Defendants' contention that Plaintiffs raised a new theory of global United States antitrust jurisdiction prohibited by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"). During oral argument on the instant motion, Plaintiffs' counsel appeared to assert that if NTN participated in a price-fixing cartel in the common market and it sold bearings to the largest auto manufacturer in the common market, this is sufficient to assume that NTN participated in a conspiracy directed at the United States. Consequently, Defendants sought leave of the Court to file a supplemental brief to address Plaintiffs' argument. In essence, Defendants claim that the FTAIA prohibits using NTN's knowledge that some of its bearings sold in foreign markets would enter the United States market to link NTN to a different conspiracy in the United States. Plaintiffs filed a timely response disputing Defendants' characterization of their theory.

> The FTAIA provides:
>
> "Sections 1 to 7 of [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect –
>
>   (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>
>   (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a. Enacted in 1982, the FTAIA "was intended to exempt from the Sherman Act export transactions that did not injure the United States economy." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 n. 23 (1993) (citing H.R. Rep. No. 97-686, at 2-3, 9-10 (1982)). "This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach." F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 162 (2004) (emphasis in original). Importantly, the FTAIA imposes a substantive requirement setting "forth an element of an antitrust claim, not a jurisdictional limit on the power of the federal courts." Minn-Chem, Inc. v. Agrium, Inc., 683 F.3d 845, 852 (7th Cir. 2012).

As correctly pointed out by Plaintiffs, Defendants' argument only applies to NTN, a foreign corporation. NTN USA is specifically alleged to manufacture and sell bearings in the United States. This type of economic conduct does not fall within the FTAIA's reach. With respect to NTN, Plaintiffs allege that NTN USA manufactured and sold price-fixed bearings directly into the United States market *at the direction of NTN*, which the Court must accept as true. Certainly, such activity affects domestic trade and commerce and is not merely foreign conduct that indirectly impacts the United States.

Next, Defendants mischaracterize Plaintiffs' antitrust conspiracy theory. Plaintiffs do not seek damages for conduct occurring entirely outside of the United States causing only foreign injury. Likewise, they do not seek remedies for domestic exporters injured in foreign ventures. Instead, Plaintiffs allege an antitrust conspiracy directed at the United States by foreign and domestic corporations, many of which are United States-based subsidiaries engaged in the manufacturing and domestic sale of the price-fixed

product at issue. For those foreign corporations without a domestic subsidiary, the importation of their price-fixed goods is covered under the Sherman Act when "actual and intended effects on U.S. commerce have been shown." Minn-Chem., 683 F.3d at 855. Plaintiffs do not allege the existence of foreign investigations in order to recover for conduct occurring in other countries, but merely to demonstrate the world-wide scope of the conspiracy. As previously stated, the existence of foreign and domestic investigations and guilty pleas of co-conspirators renders Plaintiffs' claims of a conspiracy directed at the United States plausible.

In sum, Defendants' attempted use of the FTAIA to undermine Plaintiffs' claims against NTN and NTN USA fails. The conduct at issue in this case is not the type of conduct Congress sought to exclude from the Sherman Act's reach. See Empagran, 542 U.S. at 161 (noting that the FTAIA "remov[es] from the Sherman Act's reach, (1) export activities and (2) other commercial activities taking place abroad, *unless* those activities adversely affect domestic commerce, imports to the United States or exporting activities of one engaged in such activities within the United States.") (emphasis in original). Plaintiffs have sufficiently alleged an anticompetitive conspiracy directly aimed at the United States automotive industry.

## IV. CONCLUSION

Accordingly, Defendants' motion is **DENIED**.

**IT IS SO ORDERED.**

Date: August 26, 2014               s/Marianne O. Battani
                                    MARIANNE O. BATTANI
                                    United States District Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 26, 2014.

s/ Kay Doaks
Case Manager